SEARS Administrator, complainant and appellant, *vs.* SMITH *et al.*, defendants and appellees.

The grantor of lands has a lien upon the estate sold, for the purchase money; but this lien is waived where the note or obligation of a third person is taken of the vendee for the purchase money.

The presumption in such case is that the note or obligation was taken in payment of the consideration money, and not as security for it, and the grantor's lien is consequently discharged.

This lien of the grantor exists, generally speaking, and the burthen of proof is on the purchaser to establish that in the particular case it has been intentionally displaced by consent of parties.

A grantor who has received the note of a third person upon the representations of the purchaser that the note is good, which turn out afterwards to be false, and who retains the

Sears Administrator, complainant and appellant, *vs.* Smith *et al..* defendants and appellees.

note until it is outlawed without offering to restore it to the purchaser, cannot ask the aid
of a Court of Equity to cancel the sale.

It is incumbent upon the party alleging fraud in such a case, to institute proceedings to cancel
the sale on discovering the fraud, and not to wait until the purchaser has made large outlays
in improvements on the lands so purchased.

Appeal from the Court of Chancery. The facts are sufficiently
detailed in the opinion of the Court.

————, for complainant.

————, for defendant.

By the Court, WHIPPLE, C. J.

The bill, in substance, alleges that Abraham C. Sears, in the month
of December, 1840, sold to the defendant a tract of land located in Cass
County, "for the price and sum of two hundred and sixty dollars, the
amount of a certain note or obligation, (under seal,) of principal and
interest due thereon at the time, given by one Orlin Fitzgerald and John
Fitzgerald, to Thomas Fitzgerald, his heirs and assigns, for the sum of
$212, with seven per cent interest thereon, until paid, and dated Jack-
son County, Sept. 1st, 1837; that the note was assigned by Thomas
Fitzgerald, to the defendant Smith, with a guaranty written thereon,
that he would pay the same, if it could not be collected or secured of
the makers." The bill then avers, that this note or obligation was re-
ceived of said Smith, and taken in payment for the said amount of pur-
chase money for said land, upon and in consideration of the represent-
ations of said Smith, made at the time, that the said obligation was
good; that the guaranty of said Thomas Fitzgerald was good, and that
John Fitzgerald, one of the makers, was very rich, that he had a large
farm and a large quantity of property, both personal and real; that
they were abundantly able to pay, and would pay the obligation; that
Thomas Fitzgerald was liable, and would pay the same, although it would
not be necessary to resort to him, as the makers were good; that if the
said obligation was not good or collectible from the makers, he, said
Smith, would pay the amount to grantor himself, or would stand
good for it himself, or words to that import. It is further alleged that
Smith assigned the instrument to Sears, "to enable him to control and

prosecute the claim; and he did so assign it, but stated in said assignment that it was without recourse to him." The bill then states that suit was brought against John Fitzgerald alone, on the note, and judgment recovered, and that the other maker had deceased; that execution issued on this judgment, and as nothing could be collected, it was returned unsatisfied. The bill charges that Orlin Fitzgerald died, without leaving any property, and that John Fitzgerald was insolvent at the time of the assignment of the note, which fact was well known to Smith, whose representations touching the pecuniary responsibility of the makers, were false. That being unable to collect the money due on the note from the makers, he called upon Smith, and requested him to pay the amount of the purchase money, which Smith refused to do, pretending that Sears was bound to prosecute the note, before he could be held responsible. The complainant gives as a reason for not offering to return the note to Smith, that he did not wish to part with the security the obligation afforded for realizing the amount due him. The answer of Smith denies that the consideration agreed to be paid for the land was $260, but asserts that the consideration consisted in the transfer by him to Sears, of the note, or obigation set out in the bill, and that such transfer was "in full satisfaction and payment of, and for the purchase money of said premises, to be taken and held by the complainant, at his own risk, without recourse to the defendant." The answer denies, in express terms, the fraud alleged in the bill; on the contrary alleges that it was at one time agreed upon between the parties, that the defendant should have the land at $3 per acre, to be made out of the note or obligation which was to be assigned to complainant for that purpose, with Smith's indorsement or guaranty thereon, but that subsequently this agreement was abandoned, and a new one made, by which the note was to be assigned absolutely by Smith to complainant, *without recourse*, in consequence of the increased amount given for the land.

The cause was brought on to be heard upon the bill, answer and proofs, and a decree dismissing the bill having been made by the Court of Chancery, this appeal is taken to reverse that decree.

From the view I have taken of this case, it becomes unnecessary to look very minutely into the proofs for the purpose of ascertaining whether they sustain the case made by the bill or answer.

The leading object of the bill is to enforce an equitable lien which the complainant insists he has upon the land sold and conveyed by him to Smith in December, 1840.

We had occasion to hold in the case of the Michigan State Bank *vs.* Hastings *et al.*, (1 *Doug.*,) that the vendor of lands has a lien upon the estate sold, for the purchase money; and in administering this branch of equity jurisdiction, Courts regard the vendee in the light of a trustee to the vendor. This lien exists independent of any special agreement between the parties, or of the possession by them of the thing to which it attaches, arising as it does from an implied or constructive trust. Considerable diversity of opinion has existed in the English Courts, respecting the circumstances under which this equitable lien attaches. In the American Courts, however, the current of decisions has been more uniform and consistent. By the Roman law, from which it is probable the doctrine of the vendor's lien was derived, the property passed absolutely to the buyer if the seller took another pledge, or other personal security; or, in other words, where anything was taken in satisfaction of the price, although payment was not positively made. According to Pothier, the question whether a personal credit was given to the vendee, or not, was to be judged of by all the circumstances of the case.

Mr. Justice Story deduces from a consideration of the text of the civil law, that "whenever it was doubtful whether such credit was given or not, then it was not to be presumed, unless made certain by the vendee." This principle is recognized and enforced by many learned jurists, both in England and in this country. A critical review of the numerous cases to be found in the equity reports, will sustain the doctrine that, "generally speaking, the lien of the vendor exists; and the burden of proof is on the purchaser to establish that in the particular case it has been intentionally displaced or waived by the consent of the parties." (2 *Story Com. on Eq.*, 472.) What circumstances will be deemed sufficient to authorize a Court in presuming a waiver, has been a very embarrassing question, in respect to which Judges have entertained very different opinions. It has been adjudged that taking a bond from the vendee for the purchase money, amounted to a waiver of the vendor's lien; but the weight of authority is that the taking of a

bond or note from the vendee is not to be considered an act of waiver. Again: it has been held that taking a distinct security, or a note or bond with distinct security from the vendee, or taking the security of a third person, discharges the lien. Taking the deposit of stock has been held to extinguish the lien. (6 *Vesey*, 752.) And although the Master of the Rolls in Grant *vs.* Mills, (2 *Ves. & Beam.*, 506,) held that a bill of exchange, drawn by the vendee and accepted by him and his partner, did not repel the lien, Chancellor Kent thinks the sounder and higher authority is, that taking the responsibility of a third person for the purchase money is taking security, and extinguishes the lien. It is to be observed however, that in many cases, the taking of security has been regarded as no more than a mere presumption, from which a waiver may be implied, and by no means as conclusive evidence of a waiver. The painful uncertainty which hangs over the law in this respect, induces the wish that the doctrine of the civil law, that where the vendor has carved out a security for himself he waives his equitable lien, had been adopted by Courts of Equity, in the administration of this branch of their jurisdiction. The adoption of a rule so plain, and as I think, so reasonable, would have furnished a guide both to vendors and vendees, by which their rights could have been determined without an appeal to the judicial tribunals, and rescued the law from the vexatious uncertainty in which it is involved. Assuming then, that the question of lien depends upon the intention of the parties, and that each case is to be determined upon its own particular circumstances, let us for a moment, look to the facts of the case before us and see if the proof does not show that the vendor was content to rest upon the security he took, and discharge the land.

It is to be remarked that the allegation of the bill that the price of the land was $260, is denied by the answer, which sets up that the note was given in full satisfaction and payment of the land. It is, indeed, stated in the bill that the note "was taken in payment for the said amount of purchase money for said land, upon and in consideration of the representations of said Smith, made at the time, that the said obligation was 'good." The statement in the bill indicates that the obligation was taken conditionally, while that in the answer shows that it was taken absolutely. The testimony of witnesses produced by the com-

plainant, on this point, tends rather to strengthen the narrative given by the defendant, than to support that contained in the bill. William Sears testified that "he thinks the price of the land was three dollars per acre, and that the note about paid for the land, and that Smith was to assign the note, if Sears would give him ten dollars." This witness certainly does not prove the agreement set out in the bill, while it clearly implies that the note was given in *payment* of the land. John Sears testified that "Smith was to turn a note in towards the land. Does not know whether the note paid for the land or not, or over-paid it." Mary Sears testified that "Smith was to give Abraham a note he had against Fitzgerald, for the land; thinks the note is what Abraham got for the land." Carter W. Baldwin testified that he was present when the parties had a conversation touching the sale of the land, and that "Smith proposed to give a note in payment for the land; thinks the note was to be the price of the land." ·

If these witnesses, who were present when the agreement was made respecting the sale of the land, have given a true version of what passed between the parties, it is very clear that the complainant has failed to prove the case made by the bill, and by which he is bound. No specified amount was to be given by Smith, but it is inferable that the consideration actually given and received, was the note. It was an agreement by which Sears was to convey to Smith a piece of land, in consideration that Smith would assign to him a note. The note, therefore, was not assigned as a security for the payment of the consideration money agreed to be paid by Smith, but as absolute satisfaction and payment for the land. If this view of the facts be correct, I am at a loss to determine how the doctrine contended for by the complainant can be applied. If, however, the facts would justify the conclusion to which the counsel has arrived, and ·that Smith had agreed to give a specific sum, as a consideration for the land, and assigned the note in question as an independent security, I should be inclined to adopt the views of Chancellor Walworth, in Fish *vs.* Howland, (1 *Paige*, 20.) In a learned opinion in which all the leading cases, both English and American, are carefully considered, the Chancellor says: "A much safer rule, I apprehend, is to sustain the implied lien wherever the vendor has taken the mere personal security of the purchaser only, and to consider any bond,

note, or contract, given by the vendee alone, as intended only to countervail the receipt of the purchase money contained in the deed, or to show the time and manner in which the payment is to be made, unless there is an express agreement between the parties to waive the equitable lien; and on the other hand to consider the lien as waived whenever any security is taken on the land, or otherwise, for the whole or any part of the purchase money, unless there is an express agreement that the equitable lien on the land shall be retained." "This (says the Chancellor) constitutes a safe rule, easily understood, and which, I consider, established by a weight of authority in this country which is not easily shaken." The same doctrine has been recently maintained in a well considered opinion by the Supreme Court of Vermont, reported in a recent No. of the Law Reporter.

After a very deliberate consideration of all the cases to which I have obtained access, I think the rule deduced by Chancellor Walworth, is not only in close analogy to that to be found in the code from which we have derived the doctrine of equitable liens, but is sustained by a strong array of authorities. Expediency would seem to dictate the propriety of interposing no unnecessary obstacles in the way of a free disposition of property, and of adopting a rule so plain, as to prevent the constant application to our Courts, to settle rights, which cannot be determined, in consequence of the unsettled state of the law on the subject I have been discussing.

It is suggested in the elaborately written argument with which I have been favored, that the note having been taken in payment upon the representations that it was good, and the testimony showing that these representations were false in fact, the complainant for this reason is entitled to the relief prayed for in the bill. It is not improbable that representations were made calculated to mislead the vendor, and that it would have been competent for the complainant to rescind the agreement, if proper steps had been taken for that purpose. It may be also, that a Court of Equity would have given the specific relief asked for, if the complainant by his laches had not deprived himself of now going into the question of fraud, and the other difficulties to which I have adverted could be obviated. To authorize a Court of Equity to interfere with an agreement alleged to have been fraudulently entered

32

into by one of the parties, it is the duty of the aggrieved party upon the discovery of the fraud to admonish the other party of his intentions, and upon the facts disclosed in this case the complainant would have been bound to restore the note to the defendant. He should not have waited six years after the transaction, when the note is outlawed, and parties released from their obligations, and ask the aid of a Court of Equity on the fraud assumed. It is shown by the testimony that Smith went on the land not long after he purchased, and made valuable improvements. As the facts stated in the bill, and upon which relief is claimed, were known to the complainant before these improvements were made, it was his duty to have instituted proceedings upon the discovery of the alleged fraud, and not wait until the defendant had incurred large outlays in improving the property. Besides, the letter introduced in proof, from Thomas Fitzgerald, while it denies his liability upon the guaranty indorsed on the note, admits his ability and willingness to pay it in the event that his liability was established. It was therefore incumbent on the complainant to have restored the note to the defendant, when he demanded payment of the consideration price of the land. His failure to do so might work a serious injury to the defendant, who would, upon the ground assumed by the complainant, not only lose the land, but also his remedy against the parties to the note.

The decree must be affirmed.